# EXHIBIT A

COMMONWEALTH OF MASSACHUSETTS

| | |
|---|---|
| SUFFOLK, ss. | SUPERIOR COURT<br>CIVIL ACTION NO.:<br>21-0231 |

JUDY THOMAS

    Plaintiff

    v.

JONES DAY

    Defendant

SUFFOLK COUNTY
FEB 0 2 2021
MICHAEL JOSEPH DONOVAN
CLERK OF COURT

## COMPLAINT AND JURY DEMAND

### Parties

1. The Plaintiff, Judy Thomas (hereinafter "Ms. Thomas" or "Plaintiff"), is an individual who maintains a residence at 80 Cherry Hollow Road, Nashua, Hillsborough County, New Hampshire.

2. The Defendant, Joes Day (hereinafter "Firm") is a foreign corporation with a Massachusetts place of business located at 100 High Street, Boston, Suffolk County, Massachusetts.

### Facts

3. Ms. Thomas was hired by the Firm in July 18, 2016.

4. At all times, Ms. Thomas held the position of Paralegal.

5. Ms. Thomas earned an hourly rate that annualized to $77,000 per year. With overtime, Ms. Thomas made approximately $100,000.

6. Ms. Thomas was assigned to the Real Estate and Tax Group.

7. Ms. Thomas reported directly to Attorney Doug Banghart.

8. However, Ms. Thomas supported all of the attorneys in the group; Partners John Kelley and Jeff Gaulin, and attorney associates, Brian Hern, Patrick Cronin, Brett

Heyman, Sean Jackowitz, Derek Rodman and Nina Pelc-Faszcza. Additionally, Ms. Thomas supported associates from the New York and Cleveland offices.

9. Ms. Thomas excelled at her position; in fact, she earned the confidences of her supervisors quickly and as a result was assigned the more detailed, more arduous tasks.

10. Although Ms. Thomas' work was well above average, she was constantly harassed and belittled by Attorneys Banghart and Hern.

11. A simple review of the demographics of the Firm's support staff will reveal that the Firm prefers young white women.

12. A simple review of the work product of the Firm's paralegals will reveal that these women are held to a lower standard than Ms. Thomas.

13. For example, their workloads are significantly lower than Ms. Thomas'. In fact, since the firing of Ms. Thomas, the Firm has posted two positions to replace Ms. Thomas; Boston Paralegal – Transactional and Boston Project Assistant - Transactional.

14. For example, the attorneys (including Banghart and Hern) did not demean, belittle and berate the young, white support staff as they did to Ms. Thomas.

15. For example, the young, white support staff did not have trouble getting approval to work overtime, when necessary. They were simply told to work overtime as necessary to complete their tasks, whereas, Ms. Thomas was subjected to receiving prior approval for overtime.

16. For example, Attorneys Hern, and Heyman did not create fictitious issues in the work of Ms. Thomas' direct comparator, a young, white individual.

17. Ms. Thomas was also called "stupid", "dumb", "slow", or rhetorically asked "why do we have brainless people working here?" which was behavior that her young, white colleagues were not subjected to.

18. Ms. Thomas was also subjected to meeting deadlines within unreasonable time standards, whereas her comparators were not. For example, when assigned tasks, she was often told that it shouldn't take her more than five (5) minutes to complete the tasks. If Ms. Thomas couldn't meet the unreasonable timeframe, she would be told "my secretary could do this quicker " or words to that effect.

19. Ms. Thomas complained to Attorney Banghart (specifically about Attorney Hern's behavior). Ms. Thomas complained that Attorney Hern was belittling her and was treating the young, white paralegal much favorably.

20. Unfortunately, Attorney Banghart's response was lackluster and Ms. Thomas continued to be mistreated.

21. Ms. Thomas was constantly in a Catch-22. She was assigned far too much work to complete during the course of her normal work day, and then when she requested to work overtime she was either berated for costing the Firm money or told to under bill, not to charge the extra time to the client, and to find a way to get the work done without billing the clients and not to let anyone know that she was not billing the extra hours.

22. From July 2016 to approximately February 2017, the partners were responsible for approving Ms. Thomas' overtime.

23. Soon thereafter, Attorney Banghart requested that Ms. Thomas obtain prior approval for overtime directly from the associates, rather than the partners, only to get the run-around for their approval. Although, the associates would verbally approve the overtime, on many occasions, they would fail to sign off on her overtime timesheet.

24. On many occasions Ms. Thomas did not charge the Firm nor its clients for overtime worked as she was discouraged from doing so. In fact Attorney Heyman told her that "that's what everyone does", and if she wanted to "last", she should quietly take work home without anyone knowing about it.

25. In fact, on many occasions, Attorney Heyman would let Ms. Thomas know which client to bill and which not to bill. He explained that it was all based on how much any given client was investing in a deal. (Ms. Thomas has not reported the ethical violations within the Firm to the Board of Bar Overseers.)

26. This issue was ongoing throughout Ms. Thomas' employment.

27. The Real Estate and Tax Group displayed an attitude that Ms. Thomas was faking the need to work overtime because she is black and poor.

28. For example, Attorney Jeff Gaulin stated, "if you're working overtime because you need more money, we can try an help you out" with the not-so-subtle undertone that because Ms. Thomas is black, she was broke and needed the money.

29. While Ms. Thomas was in a meeting to discuss her overtime compensation with Attorney Cronin in his office, unbeknownst to her, Attorney Gaulin came in and explained to Ms. Thomas that "he couldn't keep paying over $100,000 in overtime".

30. At that time, Attorney Gaulin stated that another black administrative personnel (on the 21st floor) would work overtime on one day and then call out sick the next, as if she was being dishonest about her need for sick time.

31. On one occasion, when Ms. Thomas went to speak with Attorney Kelley about paying her for time worked, he asked Ms. Thomas where she was from. When she responded that she is Haitian, Mr. Kelley stated, "don't people have it rough in your country?"

32. In reality, Ms. Thomas was assigned significantly more work than her younger, white comparators.

33. In July 2017 Ms. Thomas complained about the discriminatory mistreatment to the Office Administrator, Ms. Pluviose. Ms. Pluviose responded by saying that "I don't know about that". She then told Ms. Thomas, "don't believe everything that people say". At that point, Ms. Thomas requested Ms. Pluviose to be in future meetings with the partners.

34. Afterwards, no meaningful action was taken.

35. Ms. Thomas again complained to Ms. Pluviose and asked for a meeting with both her and Attorney Banghart.

36. A meeting was scheduled on October 4, 2017. Ms. Pluviose did not take the meeting seriously and showed up 30 minutes late.

37. Then, during that meeting Attorney Banghart expressed to Ms. Thomas how displeased he was that she had complained to Ms. Pluviose. He did not address the overtime compensation issues, rather, he raised alleged, fabricated performance issues.

38. Ms. Thomas expressed to Attorney Banghart that she felt that he was building a file against her in order to fire her, to which he replied "that would be hard, but then again, I can use the same tactics that I had used on people like you when I lived in South Africa" or words to that effect.

39. When Ms. Pluviose joined the meeting, Attorney Banghart asked Ms. Pluviose to reassure Ms. Thomas that there was no plan to terminate her. At that point, Ms. Pluviose replied saying "at the scale that you are billing, we might all be out of work", or words to that effect.

40. Although Ms. Thomas continued to meet with Attorney Banghart and Ms. Pluviose, again no meaningful action was taken.

41. As a result, Ms. Thomas then informed Attorney Banghart that she had planned on escalating her complaint to Human Resources.

42. Shortly thereafter, on November 14, 2017 Ms. Thomas was put on a Performance Improvement Plan.

43. Ms. Thomas' discrimination claim was filed this time to Human Resources at the same time.

44. On November 28, 2017, Ms. Thomas was contacted by Human Resources. As a result, Ms. Thomas spent approximately an hour and a half detailing her complaints.

45. On December 8, 2017, Human Resources contacted Ms. Thomas and informed her that there were no findings to her claim.

46. Thereafter, the hostile and intimidating work environment created by the attorneys dramatically increased.

47. Attorney Banghart went so far as to threaten Ms. Thomas with a wooden play gun which he kept in his desk drawer, knowing that Ms. Thomas has a fear of guns.

48. Thereafter, without reason or justification, and only to be retaliatory, Ms. Thomas' request for vacation was denied.

49. On January 18, 2018 Ms. Thomas complained to Attorney Lovitt.

50. Soon thereafter, Attorney Banghart stated to Ms. Thomas that he was very powerful in the Firm and that Ms. Lovitt would never believe her, and in fact, that Ms. Thomas' days were numbered because she was not loyal to him.

51. By that time, the mixed signals about whether Ms. Thomas was permitted to work overtime (which was mandatory if she was to complete the extraordinary work load assigned to her) coupled with the threat of termination if she didn't maintain fewer overtime hours forced Ms. Thomas to work for free.

52. Ms. Thomas conservatively estimates that she worked 2-3 hours per week unpaid.

53. The Firm's internal server will confirm that Ms. Thomas was online and working far more often than what is reflected on her timecard.

54. Furthermore, the Firm knew Ms. Thomas was working these uncompensated hours because members of the Firm would either be communicating with her while she was logged into the Firm's intranet, or because Ms. Thomas was sending emails.

55. On February 5, 2018, Ms. Thomas was terminated for allegedly lying in a meeting.

56. In reality, Attorney Banghart berated Ms Thomas to admit that she was lying until she sarcastically stated, "no matter what I say, I'm always a liar any way, but your associates always tell the truth, Okay, fine, I was lying. Either way you're using this as a ploy to get me fired, so it really doesn't matter what I say".

57. The Firm's conduct has caused Ms. Thomas to have an emotional breakdown in November 2017 and continues to have an effect today.

58. Ms. Thomas has exhausted her administrative remedies with the Massachusetts Commission Against Discrimination.

## Causes of Action

(Each Cause Of Action Incorporates Therein All Of The Paragraphs Set Forth, Hereinabove.)

### FIRST CAUSE OF ACTION – NATIONAL ORIGIN DISCRIMINATION IN VIOLATION OF MASS. GEN. LAWS CHAPTER 151B §1, et. seq.

59. This is a cause of action against the Defendant for national origin discrimination in violation of Massachusetts General Laws Chapter 151B § 1, et. seq.

60. The Plaintiff's national origin is Haiti and the Defendant was aware that her national origin is Haiti.

61. The Plaintiff was subjected to national origin discrimination, which had the purpose of creating a hostile and humiliating work environment, which interfered with the Plaintiff's ability to do her job.

62. As the result of the Defendants' conduct, Plaintiff was terminated, to her detriment.

63. As a result of the Defendants' conduct, the Plaintiff has suffered damages.

### SECOND CAUSE OF ACTION – RACE DISCRIMINATION IN VIOLATION OF MASS. GEN. LAWS CHAPTER 151B §1, et. seq.

64. This is a cause of action against the Defendants for race discrimination in violation of Massachusetts General Laws Chapter 151B § 1, et. seq.

65. The Plaintiff is Black and the Defendant was aware that Plaintiff is Black.

66. The Plaintiff was subjected to race discrimination, which had the purpose of creating a hostile and humiliating work environment, which interfered with the Plaintiff's ability to do her job.

67. As the result of the Defendants' conduct, Plaintiff was terminated, to her detriment.

68. As a result of the Defendants' conduct, the Plaintiff has suffered damages.

## THIRD CAUSE OF ACTION – SEX DISCRIMINATION IN VIOLATION OF MASS. GEN. LAWS CHAPTER 151B §1, et. seq.

69. This is a cause of action against the Defendant for gender discrimination in violation of Massachusetts General Laws Chapter 151B § 1, et. seq.

70. The Plaintiff is female. Defendant was aware that Plaintiff is female.

71. The Plaintiff was subjected to sex discrimination, which had the purpose of creating a hostile and humiliating work environment, which interfered with the Plaintiff's ability to do her job.

72. As the result of the Defendants' conduct, Plaintiff was terminated, to her detriment.

73. As a result of the Defendant's conduct, the Plaintiff has suffered damages.

## FOURTH CAUSE OF ACTION – AGE DISCRIMINATION IN VIOLATION OF MASS. GEN. LAWS CHAPTER 151B §1, et. seq.

74. This is a cause of action against the Defendant for age discrimination in violation of Massachusetts General Laws Chapter 151B § 1, et. seq.

75. At all relevant times, Plaintiff was over the age of 40. Defendant was aware that Plaintiff was over the age of 40.

76. The Plaintiff was subjected to age discrimination, which had the purpose of creating a hostile and humiliating work environment, which interfered with the Plaintiff's ability to do her job.

77. As the result of her age, the Defendant terminated Plaintiff's position.

78. As a result of the Defendant's conduct, the Plaintiff has suffered damages.

## FIFTH CAUSE OF ACTION – RETALIATION IN VIOLATION OF MASS. GEN. LAWS CHAPTER 151B §1, et. seq.

79. This is a cause of action against the Defendant for retaliation in violation of Massachusetts General Laws Chapter 151B § 1, et. seq.

80. The Plaintiff was subjected to retaliation, which had the purpose of creating an even more hostile and humiliating work environment, which interfered with the Plaintiff's ability to do his job.

81. The Plaintiff complained to Defendant about national origin, race, sex and age discrimination.

82. As a result of her complaints, Defendant terminated Plaintiff's employment.

83. As a result of the Defendant's conduct, the Plaintiff has suffered damages.

*The Plaintiff demands a jury trial on all triable issues.*

WHEREFORE, the Plaintiff hereby requests that this Honorable Court grant the following relief:

1. Judgment against the Defendants, jointly and individually;
2. Attorney's fees, costs and expert witness fees;
3. Compensatory damages for emotional distress;
4. Punitive damages pursuant to MGL c. 151B, § 9;
5. Pre-Judgment and Post-Judgment Interest, and
6. Such other relief as the Court deems just and fair.

January 27, 2021

The Plaintiff,
Judy Thomas,
By her attorney,

[signature]

Suzanne L. Herold (BBO# 675808)
Herold Law Group, P.C.
50 Terminal Street
Building 2, Suite 716
Charlestown, MA 02129
(617) 336-7196 (t)
(617) 398-2730 (f)
suzie@heroldlawgroup.com